**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE OMNICOM GROUP, INC. SECURITIES LITIGATION | 02 Civ. 4483 (RCC)<br><br>**OPINION**<br>**& ORDER** |

**RICHARD CONWAY CASEY, United States District Judge[1]:**

**I.    BACKGROUND**

New Orleans Employees' Retirement System ("NORS"), a public pension fund system, is the Lead Plaintiff in this consolidated putative class action against Omnicom Group, Inc. ("Omnicom"); John D. Wren, Omnicom's Chief Executive Officer and President; Randall J. Weisenburger, Omnicom's Executive Vice President and Chief Financial Officer; Bruce Crawford, Chairman of the Board of Directors; and Philip J. Angelastro, Senior Vice President and Controller (together "Defendants").  Plaintiffs allege that Defendants committed securities fraud in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, causing shareholders of Omnicom common stock to suffer losses.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), NORS now moves for the following: (1) to certify this action as a class action on behalf of "all persons and entities who purchased or otherwise acquired the securities of Omnicom from February 20, 2001 through and including June 11, 2002 (the "Class Period") and who were damaged thereby"[2] ("Class"); (2) to

---

[1] The Honorable Richard Conway Casey passed away on March 22, 2007.  Prior to his death, Judge Casey completed a substantial portion of the work on this case.  In his honor and on his behalf, I issue this opinion in his name.

[2] NORS seeks to exclude the following from the Class: (i) John D. Wren; (ii) Randall J. Weisenburger; (iii) Bruce Crawford; (iv) Philip J. Angelastro; (v) any parent, subsidiary or affiliate of Omnicom; (vi) any person who was an officer or director of Omnicom or any of its subsidiaries or affiliates during the Class Period; and (vii) the legal representatives, heirs,

1

appoint Lead Plaintiff NORS as the representative of the Class; and (3) to appoint Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel for the Class. (NORS' Mem. of Law at 21.) For the reasons that follow, the motion is granted in its entirety.

## II.    FACTS

Plaintiffs alleged three areas of fraud in their Corrected Consolidated Class Action Complaint ("Complaint"), and Defendants moved to dismiss. The Court granted in part and denied in part that motion, leaving one of the claims standing. The remaining claim concerns Omnicom's failure to "write down" overvalued investments and subsequent transfer of these investments to Seneca Investments, LLC ("Seneca"). See generally In re Omnicom Group, Inc. Sec. Litig., 02 Civ. 4483 (RCC), 2005 WL 735937, at *1 (S.D.N.Y. Mar. 30, 2005). The following is a summary of Plaintiffs' factual allegations relevant to the remaining claim in this action.

Omnicom is an advertising holding company that pursued a method of expansion by acquisition; between 1999 and 2002, Omnicom acquired hundreds of other companies through, in part, the issuance of common stock. (Id.) These acquisitions helped Omnicom post thirty-eight consecutive quarters of growth in revenue and earnings, thereby meeting and exceeding Wall Street growth estimates during the Class Period. (Id. ¶¶ 51, 52.)

In or about 1996, Omnicom began investing in Internet-services companies, or "e-services" companies. (Id. ¶ 6.) On Sept. 22, 1996, Omnicom announced that it had agreed to acquire minority participation in five such companies, to be owned and managed by a wholly owned subsidiary of Omnicom called Communicade, Inc. ("Communicade"). (Id. ¶¶ 8, 66.) Communicade, in turn, invested in other e-services companies. (Id. ¶ 66.) Some of these e-services companies in which

---

predecessors, successors or assigns of any of the specified excluded persons or entities. (Mem. of Law in Supp. of the Am. Mot. of Lead Pl. NORS for Class Certification 1 n.1.)

Omnicom and Communicade invested launched initial public offerings in 1999 and 2000. (Id. ¶¶ 68-70.)

When the Internet market crashed in March 2000, the value of these e-services investments declined. (Id. ¶¶ 6, 71.) This decline meant that Omnicom's earnings from operations would fail to exhibit growth for the first time in close to ten years. (Id. ¶ 6.) In May 2001, one source claimed that Omnicom's Internet investments had depreciated from $2 billion in value to less than $100 million. (Id. ¶ 76.) Plaintiffs allege that Generally Accepted Accounting Principles required that these losses be "written down" because the investments had suffered "serious, non-temporary impairment." (Id. ¶¶ 7, 79, 87, 94.) Instead, Omnicom's 2000 end-of-year financial statements, issued on February 20, 2001, the first day of the proposed Class Period, failed to include these required write downs. (Id. ¶¶ 195(a), (e), (f).) Following this initial disclosure, Omnicom allegedly "engaged in improper accounting machinations so as to remove these investments from their books without causing any negative impact on Omnicom's bottom line." (Id. ¶ 100.)

Plaintiffs allege that in May 2001, as part of this campaign, Omnicom joined with Pegasus Partners II, LP to form Seneca. (Id. ¶¶ 7-8.) Omnicom transferred the now-depreciated e-services investments from Communicade to Seneca; in exchange, Omnicom received preferred non-voting stock in Seneca, valued equally to the amount at which Omnicom was carrying its Internet investments at the time of the transfer. (Id. ¶¶ 8, 9.) Plaintiffs claim that Seneca's creation was a sham designed to obscure Omnicom's true financial state, which entailed losses exceeding $20 million attributable to its investments in e-services companies. (Id. ¶ 9.) By avoiding write downs of these losses, Omnicom's growth streak continued through the fourth quarter of 2000. (Id. ¶¶ 108-10.)

3

On June 12, 2002, the last day of the proposed Class Period, an article in the Wall Street Journal reported details of Omnicom's relationship with Seneca. (Id. ¶ 141.) Shortly thereafter, the price of Omnicom stock per share fell from $77.25 on June 11, 2002, to $50.94 on June 13, 2002. (Id. ¶¶ 14, 142.)

NORS moves the Court to certify a class of potentially thousands of persons who purchased or acquired Omnicom stock between February 20, 2001 (the date of the 2000 end-of-year financial statements) through and including June 12, 2002 (the date of publication of the Wall Street Journal article).

## II. DISCUSSION

Plaintiffs who move for class certification under Rule 23 bear the burden of demonstrating that class certification is appropriate. See, e.g., Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999). Because of the importance of the class action device in securities fraud suits, courts must construe Rule 23's requirements "liberally." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179 (2d Cir. 1990), cert. denied, 498 U.S. 1025 (1991). When evaluating a motion for class certification, a court must make factual findings relating to the requirements of Rule 23, but should refrain from evaluating who will prevail on the merits. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974) (holding that Rule 23 does not give "a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action").

Rule 23 analysis proceeds in several steps. First, a court must evaluate whether, under Rule 23(a), the proposed class meets four prerequisites: numerosity, commonality, typicality, and adequacy of representation. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997). Second,

assuming Rule 23(a)'s prerequisites are met, the Court then inquires whether the action satisfies one of Rule 23(b)'s requirements. Id. at 613-14. Here, Plaintiffs rely on Rule 23(b)(3), which requires that common issues predominate, and that proceeding as a class action be superior to other methods of adjudicating the controversy. Id. at 614. If the proposed class satisfies all of Rule 23(a)'s prerequisites and Rule 23(b)'s requirements, then the class should be certified. The third inquiry concerns definition of the specific class, such as class claims, issues, defenses, and the specific time period that the class covers. Fed. R. Civ. P. 23(c)(1)(B). Finally, a court must address proper administration of the action, including, inter alia, the appointment of class counsel under Rule 23(g) and directing proper notice to absent class members. Fed. R. Civ. P. 23(c). The Court addresses these four issues in turn.

### A. Prerequisites to a Class Action Under Rule 23(a)

The Court finds that the proposed Class satisfies all four of Rule 23(a)'s requirements.

#### 1. Numerosity

Rule 23(a) allows for class certification if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity tends to exist when the class "consists of forty or more members." In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 279 (S.D.N.Y. Oct. 24, 2003). NORS plausibly claims—without objection from Defendants—that the Class is geographically diverse and "undoubtedly consists of thousands, if not tens of thousands of members," holding some 200 million shares of Omnicom stock. (Lead Pl.'s Mem. 10.) The Court finds that NORS has met its burden of demonstrating that joinder of all of these members would be impracticable.

#### 2. Commonality

Rule 23(a)'s second prerequisite is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement, particularly in securities fraud litigation, is "generally considered a 'low hurdle' easily surmounted." In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995) (quoting Sholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 185 (N.D. Ill. 1992)). Commonality does not demand that every question of law or fact be common to every class member, but instead merely requires that the "claims arise from a common nucleus of operative facts." Teachers' Ret. Sys. of La. v. ACLN Ltd., No. 01 Civ. 11814 (LAP), 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004). Defendants do not explicitly challenge whether the proposed Class meets the commonality requirement here. The Court finds that Plaintiffs have met their burden of showing that the claims arise from a common nucleus of operative facts surrounding Defendants' alleged fraudulent accounting practices and transfer of assets.

### 3. Typicality

Rule 23(a)'s third prerequisite demands that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam)). Typicality does not demand that "the factual background of each named plaintiff's claim be identical to that of all class members," so long as "the disputed issue of law or fact occupies essentially the same degree of centrality to the named plaintiff's claim as to

that of other members in the proposed class." Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113, 122 (S.D.N.Y. Dec. 21, 2001) (quoting Caridad, 191 F.3d at 293 (citation omitted)).

Defendants argue that NORS is subject to two unique defenses, a reliance defense and a statute-of-limitations defense, which undermine the typicality of NORS's claims. (Defs.' Opp'n at 16-17.) At the class-certification stage, a court's analysis of unique defenses centers on whether these defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members. Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) ("'[Class certification] is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'") (quoting Gary Plastic, 903 F.2d at 180). Therefore, a court need not definitively resolve whether such defenses would succeed on their merits, but also need not deny certification merely because of the presence of a colorable unique defense. Compare Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983) (noting that a district court need not resolve whether a defense would ultimately prevail), with Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 201 (S.D.N.Y. 1992) (explaining that courts in this Circuit do not rigidly use the presence of unique defenses to bar certification). In practice, courts in this Circuit navigate a middle course between these two extremes when addressing unique reliance and statute-of-limitations defenses, refusing certification only when confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff. The Court addresses both defenses in turn.

     **a. The Reliance Defense**

Despite the highly contextual nature of unique-defense challenges to typicality, the Second Circuit has issued a clear rule regarding reliance defenses: individual questions of reliance are generally insufficient to defeat class certification. Korn v. Franchard Corp., 456 F.2d 1206, 1212

(2d Cir. 1972). This general rule exists for two reasons. First, in cases such as this which proceed on a "fraud on the market" theory, individual reliance is presumed. See <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153-54 (1972) (noting that in failure-to-disclose securities cases, "positive proof of reliance is not a prerequisite to recovery"). Additionally, separate, individualized proceedings may address these defenses. See, e.g., <u>In re WorldCom, Inc. Sec. Litig.</u>, No. 02 Civ. 3288 (DLC), 2005 WL 408137, at *5 (S.D.N.Y. Feb. 22, 2005) (reserving individualized issues for proceedings to follow a plenary trial of defendants' liability).

To the extent that a definite formula exists for when courts deviate from these general rules, courts do so when the putative representative plaintiff's lack of reliance is sufficiently clear. In <u>Kamerman v. Ockap Corp.</u>, 112 F.R.D. 195, 197-98 (S.D.N.Y. 1986), a case which Defendants cite, the would-be class representative admitted that he learned of misstatements before a merger vote and did not rely on an allegedly fraudulent proxy statement. However, the court in <u>In re AM Int'l, Inc. Sec. Litig.</u>, 108 F.R.D. 190, 194-195 (S.D.N.Y. 1985), rejected a typicality challenge where, unlike <u>Kamerman</u>, there was no "clear" showing of lack of reliance on alleged misstatements.

Whether NORS failed to rely on Defendants' alleged manipulation of the market is far from clear. Defendants argue that NORS's investment agent, Davis Hamilton Jackson & Associates ("DHJ"), knew of the Seneca transaction before the <u>Wall Street Journal</u> article, yet still held Omnicom stock on NORS's behalf. Because DHJ was responsible for NORS's investments, Defendants argue DHJ's knowledge should be imputed to NORS. (Defs.' Opp'n at 17-19.) Plaintiffs counter that, given Omnicom's alleged assurances to DHJ that the Seneca transaction was legitimate, DHJ was not clearly aware of the possibility the Seneca transaction was fraudulent. (NORS' Reply at 14-15.) Based on these facts, the Court finds that NORS is not clearly subject to

8

a unique reliance defense. Defendants cannot overcome <u>Korn</u>'s general rule regarding individualized reliance defenses; if appropriate, the Court can hold a separate, individualized proceeding. The possibility of a unique reliance defense therefore does not pose an unacceptable risk of drawing attention away from the central issues in this litigation.

### b. The Statute-of-Limitations Defense

Defendants' separately argue that NORS is subject to a unique statute-of-limitations defense. Section 10(b) of the Securities Exchange Act of 1934 has a one-year statute of limitations. 15 U.S.C. § 78i(e) (2000). Defendants claim that the statute of limitations began to run because DHJ's knowledge regarding the Seneca transaction constituted adequate knowledge of "storm warnings" of alleged fraud. Because the Complaint was filed more than a year after the "storm warnings," NORS's § 10(b) claim would be time barred. (Defs.' Opp'n at 20.)

This argument depends on many of the same factual allegations underlying Defendants' reliance argument. As a consequence, the requirement of a clear showing of an applicable unique defense remains applicable in this context. This court in <u>Leroy v. Paytel III Mgmt. Assocs., Inc.</u>, No. 91 Civ. 1933 (JFK), 1992 WL 367090, at *2-3 (S.D.N.Y. Nov. 24, 1992), denied class certification because I found that the plaintiff had triggered the statute of limitations by writing a letter demonstrating actual knowledge of fraud, two years before he claimed to have learned of the fraud. In contrast, the court in <u>Cross v. 21st Century Holding Co.</u>, No. 00 Civ. 4333 (MBM), 2004 WL 307306, at *3 (S.D.N.Y. Feb. 18, 2004), explicitly distinguished itself from <u>Leroy</u>, granting class certification in the face of a "far more speculative" statute-of-limitations defense.

Here, as noted, the degree of DHJ's awareness of potential fraud is unclear and disputed. In light of the Second Circuit's stringent notice requirements for triggering section 10(b)'s statute

9

of limitations, see Lentell v. Merill Lynch & Co., 396 F.3d 161, 167 (2d Cir. 2005) ("[The statute of limitations] begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."), cert. denied, 126 S. Ct. 421 (Oct. 11, 2005), the Court cannot say at this juncture that NORS is clearly subject to a unique statute-of-limitations defense. Accordingly, the extent of DHJ's knowledge, and hence Defendants' purported statute of limitation defense vis-à-vis NORS, does not pose an unacceptable risk of drawing attention away from the central issues in this litigation.

**4. Adequacy**

Rule 23(a)'s last requirement is that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This Circuit has interpreted the adequacy requirement to entail two main factors: "absence of conflict" with the Class and the "assurance of vigorous prosecution." Robinson, 267 F.3d at 170.

First, Defendants argue that NORS's interests are in conflict with those of other Class members. As the Court explains below, Defendants have not made a sufficient showing that NORS is subject to significant conflicts of interest with other putative Class members. See infra Part II.B.

Second, Defendants argue extensively that NORS has "plainly insufficient" knowledge of the litigation. (Defs.' Opp'n at 14.) Defendants maintain that NORS is "unwilling to even debate litigation strategy" amongst its board of trustees. (Id.) Defendants then launch into a lengthy discussion of the merits of their asserted defenses in an effort to suggest that NORS is unaware of the potential weaknesses in its case. (Id. 14-16.)

Defendants vigorously pursue this argument, undeterred by the Supreme Court's "express[] disapprov[al] of attacks on the adequacy of a class representative based on the representative's

ignorance." Baffa, 222 F.3d at 61 (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74 (1966)). Class representatives are inadequately informed only when they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Id. (quoting Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995)). Even more so, in "complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." Id. NORS, however, evidences understanding of basic details of this litigation and of its "authority and responsibility to direct counsel" in prosecuting the case. (See Lead Pl.'s Reply Mem. 11 (citing Davis Dep. 118:22-119:4, Oct. 24, 2005).) Indeed, during the pendency of this motion, NORS has directed counsel to actively litigate discovery issues before Magistrate Judge Dolinger. Against the backdrop of unmistakably lenient requirements, the Court finds that NORS has met its burden of demonstrating its adequacy as the representative party in this action.

**B.     Class Actions Maintainable Under Rule 23(b)(3)**

Plaintiffs ask the Court to certify the Class under Rule 23(b)(3). This Subsection has two requirements: a court must find that (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("the predominance requirement"), and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy" ("the superiority requirement"). Fed. R. Civ. P. 23(b)(3).

Defendants argue that the remaining claim in this action is actually two separate claims, one claim related to the failure to write down the e-services assets ("the write-down phase") and another claim related to the transfer of these assets to Seneca ("the Seneca transaction"), each of which

requires proof under different accounting strictures. (Defs.' Mem. in Opp'n at 21.) Beyond this observation, Defendants are far less clear in unpacking the practical significance of this argument.

On one hand, Defendants suggest that the presence of different factual and legal theories undermines the degree to which common questions of law and fact predominate. (Id.) On the other hand, Defendants also make a more robust, if somewhat vague, claim: these differences create conflicts of interest within the Class that undermine predominance and adequacy of representation. (Id.) Defendants argue that "class members seeking to recover under these two distinct claims will have markedly different incentives regarding trial strategy for the simple reason that they will be trying to prove the separate claims . . . under different accounting strictures." (Id. at 24.) Though not clear from their papers, Defendants presumably argue that the proposed Class would therefore fail Rule 23(b)(3)'s predominance requirement because the alleged intra-Class conflict implicates Rule 23(b)(3)(D)'s catch-all factor of "difficulties likely to be encountered in the management of a class action."

The Court rejects Defendants' argument for three reasons. First, the predominance requirement—a requirement which is easily met in securities fraud cases—does not demand congruity of questions of law and fact across the entire class. Amchem, 521 U.S. at 624 ("Predominance is a test readily met in certain cases alleging . . . securities fraud . . . ."). To the contrary, Plaintiffs only need to show that "issues in the class action subject to generalized proof . . . predominate over those issues that are subject to individualized proof." See In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001) (quoting Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000) (internal quotation marks omitted)). Here, for example, Defendants' scienter "with respect to each act or omission alleged to violate this

title" is a prima facie element of the entire Class's fraud claims. 15 U.S.C. § 78u-4(b)(2) (2000). To the extent that any intra-Class dissimilarities may exist here, the common issues are more important and predominate.

Second, the alleged dissimilarities of factual and legal theories in the class—if they exist—do not create a sufficiently high probability of genuine conflicts of interest within the class. The Court in Amchem—the only binding authority which Defendants cite—denied Rule 23(b)(3) certification in an asbestos case where a sprawling proposed global settlement class of potentially millions of claimants was comprised of both persons already injured by asbestos and those merely exposed to it. Amchem, 521 U.S. at 626. The conflict of interest there was salient, the Court found, because those already injured wanted to maximize generous immediate payments, while exposure victims wanted to ensure an inflation-protected fund for the future. Id. at 626-27.

Defendants' "two-claims" observation does not imply a similar degree of conflict. Defendants' vague allegations of "different incentives for trial strategy" (Defs.' Opp'n at 24) do not explain with any degree of specificity how one group of claimants will recover at the expense of another allegedly different group of claimants. Defendants add that claimants who bought stock during the write-down phase are unable to prove loss causation and are therefore in conflict with those who purchased or acquired stock after the Seneca transaction. (Id.) Plaintiffs respond that such an argument is an attempt to litigate class certification on the merits of the action. (Lead Pl.'s Reply at 8-9.) The Court agrees. Moreover, the Court is skeptical, at this stage of the case, of Defendants' theory that because this case alleges two "separate" frauds, Plaintiffs cannot use the same event to demonstrate loss causation as to both. The conflict-of-interest argument, then, fails

to undermine the predominance of common issues here and fails to undermine NORS's adequacy as the representative party.

Third, in Rule-23(b)(3) securities fraud cases, this Circuit has expressed a strong preference in favor of using judicial management tools, rather than refusing to certify a class for management reasons. See generally Visa Check, 280 F.3d at 140 ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.") (internal quotation marks omitted). Indeed, trial courts may "alter[] or amend[]" certification orders "before final judgment." Fed. R. Civ. P. 23(c)(1)(C). These orders include, but are not limited to, maintaining a class action "with respect to particular issues" in a case or dividing a class into "subclasses" with respect to particular issues. Fed. R. Civ. P. 23(c)(4). If issues concerning the write-down phase and Seneca transactions of the "common nucleus of operative facts" here do metastasize into markedly different questions of law and fact, the Court has the option of invoking these management tools at a later time.

In sum, Plaintiffs have met their burden of showing that common issues of law and fact predominate over any potential issues that may affect individual litigants. These issues, common to the Class of thousands of litigants, combined with the availability of judicial management tools, demonstrate why a class action is superior to other available methods of dispute resolution here. The Court now turns to issues regarding the definition and management of the Class.

### C. Defining the Class Under Rule 23(c)(1)(A)

Plaintiffs ask the Court to certify the Class Period from February 20, 2001 through and including June 11, 2002. Defendants argue that, at a minimum, both ends of the Class Period should be shortened.

14

### 1. The Beginning of the Class Period

Defendants claim that the initial portion of the Class Period, from February 20, 2001 (the date of Omnicom's end-of-year 2000 financial statements) to May 4, 2001 (the formation of Seneca), should be eliminated because pre-Seneca Class members "as a matter of law . . . will be unable to show loss causation." (Defs.' Opp'n at 26.) Defendants argue that the "corrective disclosure" Plaintiffs cite does not specifically mention the write-down phase, so any stock depreciation resulting from this corrective disclosure cannot be traced back to the write-down phase. (Id. 27; see also infra Part II.C.2.) Defendants advance essentially the same argument in support of their assertion that write-down claimants are in conflict with Seneca-transaction claimants. As noted, the Court remains unconvinced of the validity that Defendants' theory that a single corrective disclosure cannot act as proof of loss causation for two separate but related frauds. In any event, it would be inappropriate to render the determination as to loss causation at this stage of the litigation.

### 2. The End of the Class Period

Defendants also claim that the end date of the Class Period should be September 17, 2001, not June 11, 2002. (Defs.' Opp'n at 27-28.) The end date of a class period in securities fraud litigation depends on the particular fraud theory advanced. Here, Plaintiffs allege a "fraud-on-the-market" theory where Defendants' actions allegedly prevented an efficient market from accurately valuing inflated stock prices. (Lead Pl.'s Mem. at 3, 17.) A publicly-available "corrective disclosure" (e.g., a newspaper article) provides information that allows an efficient market to adjust and marks the end of the Class Period. Defendants claim that a September 17, 2001 article in Fortune published the same facts as the June 11, 2002 Wall Street Journal Article, and that the Fortune article represents the first "corrective disclosure" regarding Seneca. (Defs.' Opp'n at 5, 28.)

15

Whether the relevant corrective disclosure occurred on September 17, 2001 or June 11, 2002 is likely to be determined by a jury, but in any event should not be determined at this time. For the same reasons cited above regarding judicial economy and the Court's unwillingness to turn class certification into a partial summary judgment on the merits, the Court also declines to shorten the back end of the Class Period.

### D.     Trial Administration of the Class Under Rule 23(c)

In addition to defining the class under Rule 23(c)(1)(B), courts certifying class actions also have the responsibility of handling other administrative tasks under Rule 23, such as appointment of class counsel and direction of notice to absent class members.

#### 1.     Appointment of Class Counsel

Class certification orders must appoint class counsel under Rule 23(g). Fed. R. Civ. P. 23(c)(1)(B). Rule 23(g), in turn, requires that class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Other courts have recognized the competence of the proposed Class Counsel, Bernstein Litowitz Berger and Grossmann LLP, and Defendants do not challenge their appointment. See, e.g., In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *18 (S.D.N.Y. Nov. 12, 2004). The Court thus appoints Bernstein Litowitz as Class Counsel.

#### 2.     Notice for Absent Class Members

Because this Class is certified under Rule 23(b)(3), the Court "must direct to class members the best notice practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The Court directs Plaintiffs to propose, within 21 days, a comprehensive plan for providing notice to absent class

members in conformity with Rule 23(c)(2)(B)'s requirements. After reviewing this proposal, the Court shall then direct appropriate notice.

The Court is aware that some counsel seek a premotion conference relating to proposed summary judgment motions. The judge to whom this matter is assigned will address this issue.

### III.   CONCLUSION

Lead Plaintiff's motion for class certification is granted in its entirety. Additionally, the Court orders Plaintiffs to propose a plan for providing notice, as described herein.

**So Ordered:**   New York, New York
April 30, 2007

_____
John F. Keenan, U.S.D.J.